Receipt number 9998-5127140

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## Bid Protest

NATIONAL GOVERNMENT SERVICES, INC.
        *Plaintiff*,

v.

THE UNITED STATES,
        *Defendant*.

No. 19-14 C

## COMPLAINT

Plaintiff, National Government Services, Inc. ("NGS"), in this pre-award Bid Protest Complaint against Defendant, United States of America, alleges as follows:

### I.    NATURE OF THE ACTION

1. This is an action by NGS challenging a single specific provision in two solicitations issued by the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services' ("CMS" or "agency"): Solicitation No. 75FCMC18R0014, for Provider Enrollment and Oversight services (the "PEO RFP"), and No. 75FCMC19R0003 for Research, Measurement, Assessment, Design, and Analysis services (the "RMADA RFP") (collectively, the "RFPs" or "Solicitations").

2. The PEO RFP seeks a contractor to help detect, prevent, and proactively deter fraud, waste, and abuse in the Medicare and Medicaid programs. The RMADA RFP seeks a contractor to perform a wide range of analytic support and technical assistance activities that support models and demonstration programs under the Patient Protection & Affordable Care Act

(ACA), the Medicare Access and CHIP Reauthorization Act, other non-ACA statutes, and future health reform legislation.

3.      Both RFPs contain a broad, ambiguous requirement pursuant to which an offeror must disclose a significant amount of vaguely described information regarding the conduct of entities in any way affiliated with the offeror — ostensibly to allow for CMS to undertake an integrity/responsibility analysis — regardless of whether the conduct of those affiliated entities reasonably could be attributed to the offeror (the "Disclosure Provision").

4.      Thus, the Disclosure Provision calls for NGS to provide information about a myriad of commercial entities that share the same corporate parent, Anthem, Inc., despite the fact that those entities do no federal contracting work and operate independently from NGS.  (Indeed, Anthem itself plays no role in NGS' day-to-day operations.)

5.      The Disclosure Provision is overbroad and unduly burdensome, for no discernible purpose, because the information it seeks is irrelevant to any responsibility analysis CMS may undertake.

6.      On December 21, 2018, undersigned counsel for NGS submitted a letter to Ms. Gina Romano, the Contracting Officer for the PEO RFP, demonstrating that the requirement at issue is arbitrary, capricious, and contrary to law, and requesting that CMS apply a more limited disclosure obligation, under which offerors would be required to provide the requested information only for those affiliates *whose conduct could be attributed to the offeror*.  In particular, NGS requested that CMS revert back to language it employed in similar requirements in previous procurements.  CMS has not responded to that letter in writing, and proposals in response to the PEO RFP are due today, January 3, 2019.

7. On December 27, 2018, NGS forwarded the December 21 letter to Mr. John Cruse, the Contracting Officer for the RMADA procurement. Proposals in response to the RMADA RFP are due on January 16, 2018.

8. This protest, which challenges a term of both the PEO and RMADA RFPs, is being filed on or before the proposal submission due dates for both, and therefore is timely.

9. At this time, NGS does not anticipate requesting temporary or preliminary injunctive relief, as NGS believes that this protest can be resolved prior to contract award in both procurements. However, if the Government is unwilling or unable to withhold award until after the Court's resolution of the protest, then NGS reserves the right to seek temporary or preliminary injunctive relief to prevent such awards from being made. Undersigned counsel for NGS anticipates speaking with counsel for the Department of Justice about this issue prior to the Initial Status Conference in this matter.

## II.     JURISDICTION

10. This Court has jurisdiction over this bid protest action pursuant to 28 U.S.C. § 1491(b).

## III.    THE PARTIES

11. NGS is a company headquartered in Indianapolis, Indiana.

12. Since the inception of the Medicare program in 1966, NGS has served as a partner with the federal government to administer government health care programs.

13. As one of the leading Medicare contractors in the country, NGS processes approximately 252 million claims on an annual basis, or an average of $75 billion in payments.

14. The defendant is the United States Government, acting through CMS.

## IV.     RELEVANT BACKGROUND

**The Disclosure Provision in the PEO and RMADA RFPs**

15.     On October 18, 2018 CMS issued PEO RFP, for a contractor to help detect, prevent, and proactively deter fraud, waste, and abuse in the Medicare and Medicaid programs. Exhibit 1 (PEO RFP Attach. J.1) at 4.

16.     The deadline for proposals was due on November 27, 2018, but was subsequently extended to today, January 3, 2019.  NGS is submitting a proposal in response today.

17.     Attachment J.2.A to the PEO RFP, entitled "Contractor Business Ethics, Conflicts of Interest and Compliance Program Requirements," contains the Disclosure Provision at issue here:

> Offeror/Contractor shall disclose any and all known violations and alleged acts, within the past ten (10) years, related to following [sic] for itself, ***its parent and affiliated companies or subcontractors*** -
>
> ✓     False Claims Act,
> ✓     Civil Monetary Penalties,
> ✓     Criminal investigations and/or indictments, and,
> ✓     *Qui tam* lawsuits or other administrative misconduct.
>
> The Offeror/Contractor shall also disclose in its submission whether the information contained in System for Award Management (SAM) and the Federal Awardee Performance and Integrity Information System (FAPIIS) is current, accurate and complete.  If it is not, all such information required herein, that is not reported in SAM or FAPIIS, shall be disclosed with this submission.

Exhibit 2 (PEO RFP Attach. J.2.A) at 3 (emphasis added).

18.     Attachment J.2.A of the PEO RFP initially required offerors to certify the accuracy of their representations in response to the Attachment, including those in the Disclosure Provision.  *Id.* at 3-4.  (On January 2, 2019, CMS removed the certification requirement from the PEO RFP via a solicitation amendment.)

4

19. CMS issued the RMADA RFP on November 20, 2108, with a proposal submission deadline of January 16, 2019.  NGS anticipates submitting proposal in response on or before that date.

20. The RMADA RFP contains the identical Disclosure Provision as the PEO RFP. *See* Exhibit 3 (RMADA RFP Attach. J.7) at 3.

21. CMS has included the Disclosure Provision in previous solicitations, but clarified that the term "Offeror" for the purpose of that provision meant "the Offeror and any parent or affiliate of the Offeror *__whose conduct may be attributed to the Offeror__*."  *See, e.g.*, Exhibit 4 (RFP No. HHSM-500-2014-RFP-0069 Attach. J.20) at 8 (emphasis added); Exhibit 5 (RFP No. RFP-CMS-2015-8A-0101 Attach J.5) at 1 (emphasis added).

22. The Disclosure Provision in the PEO and RMADA RFPs, however, contains no such limiting definition of "Offeror," despite the fact that the Solicitations explicitly define "affiliate" using the definition at FAR 2.101: "associated business concerns or individual(s) if, directly or indirectly, either one controls or can control the other; or a third party controls or can control both."  Exhibit 6 (PEO RFP § H.1(b)) at 2; Exhibit 7 (RMADA RFP § H.3(b)) at 3.

23. The Solicitations also provide the following as examples of "affiliate control":

(a) Interlocking management or ownership (e.g., individuals serving in similar capacities in several companies);

(b) Identity of interests among family members such as spouse/domestic partner and/or any dependent of the respondent;

(c) Shared facilities and equipment;

(d) Common use of employees; or

(e) A business concern organized just prior to, or immediately following, the release of a solicitation or request for information, which has the same or similar management, ownership, or principal employees as the offeror or Contractor.

Ex. 6 at 2; Ex. 7 at 3.

24. The Solicitations further provide that "[a]ny business, whether or not it is organized for profit or located in the United States or its outlying areas, or person may be found to be an affiliate. Control may be affirmative or negative and it is immaterial whether it is exercised so long as the power to control exists." Ex. 6 at 2; Ex. 7 at 3.

25. All of the language above confirms that, absent the limited definition of an "Offeror" CMS previously employed, the current version of that provision at issue here mandates the disclosure of extensive information relating to conduct for ***any affiliated entity of the offeror, regardless of whether the affiliate's conduct is attributable to offeror***.

26. While by way of the Disclosure Provision, CMS requires offerors to provide affiliate information regardless of whether the affiliate's conduct may be attributed to the offeror, CMS does exactly the opposite for purposes of crediting an offeror for the past performance of its affiliates. The PEO RFP directs that an offeror may submit ***exactly one*** past performance reference for an affiliated entity, and only if the offeror can "***clearly demonstrate[] the factual basis for how the affiliate will be involved in contract performance and how the affiliate will share resources with the offeror.***" Exhibit 6 (PEO RFP § L.15) at 8 (emphasis added).

**NGS' Corporate Structure**

27. NGS is 100% owned by Federal Government Solutions, LLC ("FGS"), a holding company that does not itself perform any government contracts. FGS is a wholly owned subsidiary of ATH Holding Company, LLC, which is, in turn, a wholly owned subsidiary of Anthem, Inc.

28. All told, NGS has approximately 173 affiliated entities under the Anthem, Inc. corporate umbrella. With but a few exceptions, almost all such affiliated entities do ***not*** hold any Federal contracts subject to the Federal Acquisition Regulation. Affidavit of Vicki Cobb (hereinafter "Cobb Aff.") ¶4.

29. NGS, through firewall and other means, maintains independence from non-FGS Anthem affiliates in order to segregate NGS' federal services operations from Anthem's commercial and government insurance and healthcare operations. NGS does so in order to avoid organizational conflicts of interest, to ensure NGS' compliance with various federal regulations, and to ensure that those regulations inapplicable to commercial entities are not flowed down to non-FGS Anthem affiliates. As a result of this separation, NGS operates wholly independently from its affiliated commercial entities under the Anthem corporate umbrella. Cobb Aff. ¶5.

30. All NGS employees are fully dedicated to supporting NGS and as a result, do not simultaneously support any other non-FGS Anthem affiliate. Cobb Aff. ¶6.

31. NGS is specifically designed from an organizational and governance perspective to focus on providing services to the federal government, particularly to CMS. NGS' separate and independent corporate structure, facilities, and personnel make it well-positioned to continually and effectively operate independent of the other legal entities and commercial lines of business in the Anthem family. Cobb Aff. ¶7.

32. NGS has a six-member Board of Directors, five of whom are outside directors not otherwise affiliated with Anthem or other non-FGS affiliates. Cobb Aff. ¶8.

33. NGS' Board of Directors Compliance Committee, made up exclusively of NGS' external Board Members, oversees NGS' Compliance Program. Cobb Aff. ¶9.

34. Consistent with CMS guidance, NGS has its own dedicated compliance functions, with Vicki Cobb serving as NGS' Chief Compliance and Privacy Officer. Ms. Cobb reports to the NGS Chief Operating Officer, and only the NGS Compliance Committee has final disciplinary authority over Ms. Cobb. Cobb Aff. ¶10.

35. In addition, NGS has its own dedicated compliance and audit teams, and the FGS business unit similarly has its own dedicated legal team that provides legal support to NGS and FGS more generally. The FGS business unit legal team does not support any of Anthem's commercial and Medicare Advantage business units, which works to further separate NGS' operations from other non-FGS Anthem affiliates. Cobb Aff. ¶11.

36. NGS has no control over, or insight into, Anthem or its non-FGS affiliates' operations, governance, or compliance practice. Cobb Aff. ¶12.

37. Anthem does not exercise day-to-day control over NGS' operations. Cobb Aff. ¶13.

38. While some employees supporting the FGS business unit also provide support to NGS, they only access and use NGS' information for the purpose of supporting the performance of NGS' contracts with CMS. Cobb Aff. ¶14.

39. The FGS business unit consists of, and provides oversight and shared services support for NGS; NGS Federal, LLC; WellPoint Health Solutions, Inc.; WellPoint Military Care Corporation; and Anthem's Federal Employees Health Benefits Program operations (known as the "FEHBP" or "FEP" business unit). Of those, only NGS and FEHBP/FEP currently perform government contracts subject to the FAR. The FGS business unit provides some general and administrative support services to NGS, but does not support other non-FGS business unit entities or Anthem commercial insurance operations. Cobb Aff. ¶15.

40.     NGS' primary facilities are, for the most part, stand-alone NGS exclusive sites.  Where sites are shared with other non-Federal Anthem operations or operations of other non-FGS affiliates, NGS' space is separately controlled and secured.  NGS also has a stand-alone systems environment that is managed exclusively by NGS employees.  Cobb Aff. ¶16.

**NGS' November 30, 2018 Letter to CMS Regarding the Definition of "Offeror"**

41.     As demonstrated above, the Disclosure Provision contained in both solicitations at issue is overbroad because it applies to an offeror's parents or affiliates, regardless of whether their actions may be attributed to the offeror.  This imposes a significant burden on companies such as NGS, which is part of a larger corporate family that contains many commercial entities operating entirely independently of NGS.

42.     NGS raised this concern with CMS in a letter dated November 30, 2018, with regard to PEO RFP.  (A copy of NGS' November 30, 2018 letter is attached hereto as Exhibit 8.)

43.     In that letter, NGS requested that CMS confirm that the term "Offeror" in the Disclosure Provision track the prior definition CMS has utilized, in which "Offeror" included only affiliates *whose conduct could be attributed to the offeror itself*.  NGS explained that read without this limitation, the Disclosure Provision would be both vague and unreasonably burdensome, because it would require the disclosure of information about all affiliates, irrespective of what line of business the affiliate was in, whether the affiliate had any involvement with federal contracts, or had any interaction whatsoever with the offering entity. Ex. 8 at 1-4.

44.     CMS did not respond to NGS' November 30, 2018 letter.

**CMS Issues Amendment 0005 to the PEO RFP**

45.     Instead, on December 18, 2018, CMS issued Amendment 0005 to the PEO RFP, which included the agency's responses to various questions about the procurement.

46. In those responses, CMS confirmed that the agency's intention was, indeed, to delimit the definition of "Offeror" in the Disclosure Provision, such that offerors were required to disclose the specified information for all of their affiliated entities *regardless of whether their conduct could be attributed to the offeror*.

**NGS' December 21, 2018 Letter to CMS**

47. In response to Amendment 0005, on December 21, 2018, NGS submitted another letter to CMS regarding the Disclosure Provision. (A copy of NGS' December 21, 2018 letter is attached hereto as Exhibit 9.)

48. In that letter, NGS requested that CMS reconsider its position regarding the definition of "Offeror" and the scope of the Disclosure Provision.

49. NGS explained that CMS' broad application of the Disclosure Provision not only is unreasonably broad and unduly burdensome, but also: (1) plainly inconsistent with the direct guidance in the Federal Acquisition Regulation (FAR) regarding agency assessments of contractor integrity/responsibility; (2) inconsistent with the PEO RFP's instructions regarding offeror reliance on the past performance of affiliated entities; and (3) coupled with an impermissible certification requirement.

50. In its letter, NGS proposed a simple fix — that CMS simply confirm that it will apply the prior definition of "Offeror" for purposes of the Disclosure Provision, and remove the certification requirement in PEO RFP Attachment J.2.A. NGS explained that should CMS refuse to take these steps, NGS would have no choice but to file a pre-award protest challenging these solicitation terms.

51. On December 27, 2018, NGS forward the December 21, 2018 letter to Mr. Cruse, the Contracting Officer for the RMADA procurement.

52. As of the date of this filing, CMS has not responded in writing to NGS' December 21 letter.  However, on January 2, 2019, in response to the concern NGS raised in that letter about the certification requirement in the PEO RFP, CMS issued Amendment 0008 to the PEO RFP.  Amendment 0008 instructed offerors that Attachment J.2.A had been revised "to remove all references to the certification including the requirement for signature on Page 4 of the attachment."  (As of the date of this filing, CMS has not issued a comparable amendment to the RMADA RFP.)   The Disclosure Provision in the PEO RFP otherwise remains unchanged.

**COUNT I—CMS' Application of the Disclosure Provisions Is Arbitrary, Capricious, and/or Otherwise Contrary to Law Because It Is Inconsistent With FAR Provisions Regarding Responsibility Determinations, and Is Unreasonably Burdensome**

53. NGS hereby incorporates the foregoing paragraphs 1 – 52, as if fully stated herein.

54. CMS's application of the Disclosure Provision is inconsistent with the FAR's language regarding responsibility determinations, and is unreasonably burdensome.

55. The Disclosure Provision, which focuses on "Contractor Integrity/Misconduct," pertains to offeror responsibility under FAR Subpart 9.1.  Indeed, the Disclosure Provision's focus on integrity and business misconduct is a direct reference to FAR 9.104-1(d), which requires an agency to consider whether an offeror has "a satisfactory record of integrity and business ethics."

56. But in the context of a responsibility assessment under 9.104-1(d), the FAR explicitly delineates when and how the responsibility of an offeror's "affiliates" should impact a determination of the responsibility of the offeror itself.  Specifically, FAR 9.104-3(c) directs that an offeror's "affiliated concerns" are "***normally considered separate entities*** in determining whether the concern that is to perform the contract meets the applicable standards for responsibility."  (Emphasis added.)

57. The FAR highlights its intention to distinguish offerors from affiliates for purposes of responsibility determinations through the lone exception it creates to the general rule. While the default direction is that affiliates are distinct from offerors, FAR 9.104-3(c) also instructs that the contracting officer shall consider a particular "affiliate's past performance and integrity *when they may adversely affect the prospective contractor's responsibility*" (emphasis added). This is entirely reasonable — where the past performance or integrity of an affiliated entity may call into question the responsibility or performance of an offeror itself, the affiliate's integrity *should* be included as part of a responsibility determination. On the other hand, absent such circumstances, there is no reasonable basis for an agency to impute the responsibility or integrity of an affiliated entity to the offeror. The FAR confirms this.

58. In contrast to CMS' current approach, the agency's prior definition of "Offeror" — which included parents or affiliated entities only where their conduct could be attributed to the offeror — was consistent with FAR's responsibility framework. CMS' current application repudiates the FAR's framework.

59. By requiring offerors to submit extensive information about themselves as well as every one of their corporate affiliates, *without consideration of whether that affiliate conduct may be attributed to the offeror*, CMS effectively has defined "offeror" as the entire corporate family of the named offering entity. But CMS has provided no justification for doing so, nor is such a definition reasonable. That definition also is patently inconsistent with the FAR's definition of those terms, which has been incorporated explicitly into the RFPs at issue.

60. The unreasonable nature of CMS' current application of the requirement — as documented in Amendment 0005 to the PEO procurement — is confirmed by the fact that it

obligates NGS to provide information on all 173 of its affiliated entities, regardless of whether they could in any way impact NGS' performance, or are in the federal contracting space at all.

61. NGS, through firewall and other means, maintains independence from non-FGS Anthem affiliates in order to segregate NGS' federal services operations from Anthem's commercial and government insurance and healthcare operations. NGS does so in order to avoid organizational conflicts of interest, to ensure NGS' compliance with various federal regulations, and to ensure that those regulations inapplicable to commercial entities are not flowed down to non-FGS Anthem affiliates. As a result of this separation, NGS operates wholly independently from its affiliated commercial entities under the Anthem corporate umbrella. Cobb Aff. ¶5.

62. Critically, and as relevant here, NGS has its own compliance and audit teams, and a dedicated Chief Compliance and Privacy Officer who reports to NGS' dedicated Chief Operating Officer and Board of Directors. Cobb Aff. ¶¶10, 11.

63. NGS has no control over Anthem and its non-FGS affiliates with respect to operations, governance, and — most importantly — compliance. Cobb Aff. ¶12. It is patently unreasonable to require NGS to submit extensive information regarding Anthem's non-FGS affiliates, much less assess NGS' responsibility based on acts of affiliates from which NGS is operationally segregated.

64. Moreover, CMS' current approach not only runs afoul of the FAR, but also is fundamentally disconnected from the purported purpose of PEO RFP Attachment J.2.A/RMADA Attachment J.3 generally — to assess "***Contractor*** Business Ethics, Conflicts of Interest and Compliance Program Requirements." Ex. 2 at 1; Ex. 3 at 1 (emphasis added).

## COUNT II—THE DISCLOSURE PROVISION'S LANGUAGE IS VAGUE, AMBIGUOUS, AND ALMOST IMPOSSIBLY BROAD

65. NGS hereby incorporates the foregoing paragraphs 1 – 64, as if fully stated herein.

66. The Disclosure Provision also directs offerors to disclose "alleged acts" in addition to actual "violations," criminal and civil "proceedings," and other self-identified "misconduct." Ex. 2 at 3; Ex. 3 at 3.

67. Taken literally, a requirement to disclose "alleged acts" — unmoored from a formal investigative or adjudicative process — means that any frivolous allegation, wherever cast, could create a disclosable event. And while the Disclosure Provision identifies allegations that fall within four specific categories — (1) False Claims Act, (2) civil monetary penalties, (3) criminal investigations/indictments, and (4) qui tam lawsuits and administrative misconduct — the challenged provision also requires the disclosure of allegations that are merely "related to" those categories.

68. None of the foregoing terms are defined, and the inclusion of the words "related to" only exacerbates the problem, rendering the mandates of the Disclosure Provision vague and ambiguous in the extreme. It would be impossible for an offeror to define which "alleged" acts are sufficiently "related to" a "criminal investigation" or "administrative misconduct" to require disclosure. No company can possibly monitor the entire world for any and all "allegations" of "misconduct" under this framework.

69. Absent the prior limitation on the term "Offeror," the Disclosure Provision would seek irrelevant information and impose disclosure obligations far broader than anything required by, and effectively in derogation of, the FAR.

**COUNT III—CMS' Definition of "Offeror" in the Disclosure Provision Is Inconsistent With the PEO RFP's Past Performance Instructions, Further Confirming That The Disclosure Provision Is Arbitrary and Capricious**

70. NGS hereby incorporates the foregoing paragraphs 1 – 69, as if fully stated herein.

71. CMS' expansive reading of "Offeror" for purposes of the Disclosure Provision is inconsistent with the PEO RFP's instructions regarding offeror reliance on affiliate past performance.

72. Whereas under the Disclosure Provision, CMS requires offerors to identify allegations made against all affiliates regardless of whether their conduct could be attributable to the offeror, CMS takes a far narrower view of the relevance of an affiliate's performance for purposes of an offeror's past performance evaluation.

73. The PEO RFP directs that an offeror may submit *exactly one* past performance reference for an affiliated entity, with the caveat that an offeror must "*clearly demonstrate[] the factual basis for how the affiliate will be involved in contract performance and how the affiliate will share resources with the offeror.*" Ex. 6 at 8 (emphasis added).

74. The limitation on an offeror's ability to rely upon the past performance of an affiliate only where the offeror can demonstrate that the resources of that affiliate will be available to the offeror is consistent with the FAR and established jurisprudence regarding past performance evaluations. But that limitation is irreconcilable with CMS' unreasonably broad definition of "Offeror" for purposes of the Disclosure Provision. For this reason as well, the Disclosure Provision is arbitrary and capricious.

**PRAYER FOR RELIEF**

NGS respectfully requests that the Court rule in NGS' favor that does all of the following (and/or issue a permanent injunction effectuating the same):

- Declare that CMS' current definition of "Offeror" in the Disclosure Provision is overbroad, arbitrary, capricious, and an abuse of discretion;

- Direct that NGS be reimbursed for its costs of filing and pursuing this Protest, including fees for outside counsel, in-house counsel, and consultants; and

- Provide any other such relief as this Court deems appropriate.

                                              **Respectfully submitted,**

                                              s/ Anuj Vohra
                                              ANUJ VOHRA
                                              JAMES G. PEYSTER
                                              CHARLES BAEK
                                              Crowell & Moring, LLP
                                              1001 Pennsylvania Avenue, NW
                                              Washington, D.C. 20004
                                              Tel: 202.624.2502
                                              Fax: 202.628.5116
                                              avohra@crowell.com

                                              *Counsel for National Government Services, Inc.*

OF COUNSEL:

MATTHEW H. SOLOMSON
Chief Legal Officer
National Government Services, Inc.
8115 Knue Road
Indianapolis, IN 46250

Dated: January 3, 2019